

IAB investigators worked with uniformed patrol in arresting a night club owner who offered the precinct sector payments for non-enforcement of noise violations.





The officers returned to the club the following evening to attend to similar complaints; however, this time the manager offered them a bottle of tequila to ignore the complaint. When the officers refused, the manager dropped an envelope containing US currency into their vehicle. The officers notified the patrol sergeant, who in turn notified IAB investigators, who intervened initially by assisting the officers in clarifying the manager's objective in providing them with the money. IAB investigators then arranged and captured on audio and videotape six controlled meetings between the officers and club officials. At each encounter the officers were given a sum of US currency in exchange for providing the club with immunity from law enforcement activity. On the final payment and subsequent to conferring with the District Attorney's Office, IAB investigators arrested the owner of the club and several of his managers. They were charged with Bribery, Rewarding Official Misconduct, and Giving Unlawful Gratuities. The criminal trials are pending.

2006 ANNUAL REPORT | 69



ARRESTS FOR FALSE REPORTS

The Internal Affairs Bureau is committed to discovering the truth and presenting the facts. If an investigation determines an intentional false report, Internal Affairs investigators will seek to arrest and prosecute those individuals. Examples of arrests made in 2006 for Falsely Reporting an Incident follow.



Defendant's EZ Pass records belie his original statements.

A retired NYC police detective notified IAB investigators that he was extorted by members of the Department. The complainant claimed he was hired to escort a truck driver and his cargo from a location in NYC to a warehouse in another state. He was later contacted by a detective from a specialized unit who threatened to arrest him for transporting stolen merchandise unless he provided the detective with a monthly payment. The complainant supposedly made the payments for the next 37 months. IAB investigators commenced an immediate and comprehensive investigation. Photo arrays, database inquiries, and numerous conferrals were completed in an effort to identify the subject. Additionally, ▬▬▬▬▬▬▬▬▬▬▬▬▬, conducted in the vicinity of the location where the complainant originally met with the truck driver. The State Police assisted in identifying the pay-off locations as alleged by the complainant and subpoenas for the lease records of the warehouse were obtained. The records indicated that the name on the rental agreement and the time span of rentals show that the complainant's account of the incidents were false. After analyzing the facts and circumstances of the case, the focus of the investigation changed. IAB investigators interviewed the retired detective again. They carefully reviewed his telephone records and determined that he had contact with illegal social clubs; a review of his EZ pass records indicated that contrary to his statements, he made numerous trips to the out of state location. Investigators learned that the complainant had a gambling problem and was in serious debt. Unable to pay his rent, he lied to his landlord by explaining that he was paying-off the police and was therefore penniless. The former member of the service was arrested and charged not only with Falsely Reporting an Incident, but Grand Larceny, since the investigation also disclosed he was operating a stolen vehicle. He has since withdrawn his extortion complaint. The criminal trial is pending.

*An arrestee alleged that she was sexually abused in a Department vehicle by the officer who escorted her to the precinct. IAB investigators responded immediately to interview the complainant. Though she reiterated the allegation, investigators elicited several inconsistencies in her statements. As the investigation progressed, the complainant became increasingly evasive and uncooperative. A Grand Jury subpoena was executed and when she was re-interviewed at the District Attorney's Office, she admitted to fabricating the allegation against the officer. Subsequently, the complainant was re-arrested and charged with Obstructing Governmental Administration and Falsely Reporting an Incident. The criminal trial is pending.*



*Members of an anti-crime team arrested a recidivist narcotics offender during a drug transaction. He later alleged that his arresting officers stole his money given that his copy of the invoice documented an amount much less than the $23,000 he supposedly had stored in the trunk of his car. Once notified, IAB investigators initiated a comprehensive investigation. The defendant remained adamant about the theft; however, when he appeared in Criminal Court to enter a plea with the understanding that he would be sentenced to four years to life, he was also told he would have to forfeit the money. The defendant stated, while under oath, that the money invoiced constituted all the money he possessed at the time of his arrest and that no amount was stolen. He was charged additionally with Falsely Reporting an Incident. He pled guilty to Criminal Contempt and was fined.*

*In the past several years, IAB has arrested 55 individuals for falsely reporting corruption or serious misconduct against a member of our Department.*

2006 ANNUAL REPORT | 73



ARRESTS • SUSPENSIONS • MODIFIED ASSIGNMENTS




# ARRESTS • SUSPENSIONS



The Internal Affairs Bureau records statistics involving the arrest, suspension, and modification of duty status of Police Department personnel. The number of Uniformed Members, TEA (Traffic Enforcement Agents), SSA (School Safety Agents), and Civilian Other members who were arrested, suspended, or placed on Modified Assignment increased 24% from 551 in 2005 to 687 in 2006. 25% of arrests, suspensions, and modifications were related to domestic incidents.

Arrests of Police Department personnel increased overall in 2006. Arrests of Uniformed Members increased 25% from 91 to 114, while arrests of Civilian Other increased 44% from 45 to 65. Arrests of School Safety Agents increased 23% from 26 to 32 and arrests of Traffic Enforcement Agents increased 30% from 27 to 35. Assault, the predominant charge in arrests of Uniformed Members, Civilian Other, and Traffic Enforcement Agents, increased as follows: 24% for Uniformed Members, 21% for Civilian Other, and 57% for Traffic Enforcement Agents. Although there were no School Safety Agents arrested for assault, 9 were arrested



NOTE: TEA (Traffic Enforcement Agents) and SSA (School Safety Agents) are not included in the category of Civilian other.

# MODIFIED ASSIGNMENTS

for Aggravated Harassment compared with zero in 2005. Uniformed Members arrested for DWI increased 33% in 2006 from 12 to 16.

**S**uspension temporarily disallows a member of the service from performing his/her duties. Suspensions of Uniformed Members decreased 11% from 159 to 142. Civilian Other and Traffic Enforcement Agents suspensions increased 24% from 38 to 47, and 17% from 12 to 14, respectively. Suspensions of School Safety Agents showed the highest increase of 63% from 16 to 26*.

**M**odified Assignment, applicable only to Uniformed Members of the service, assigns such members to non-enforcement duties pending a determination of their suitability to perform police duties. In 2006, modifications of Uniformed Members of the Service increased 55%; furthermore, domestic incidents were a factor in 45% of the total modifications. The top three charges involved in a duty status modification were Harassment, Violations of Rules and Procedures, and Engaging in Disputes.



NOTE: TEA (Traffic Enforcement Agents) and SSA (School Safety Agents) are not included in the category of Civilian other.



---

* Under New York State law, prior to a disciplinary hearing, a member may be suspended for up to thirty days without pay or benefits.



**PROACTIVE MEASURES**

Integrity Testing is a proactive technique employed as part of the Department's overall anti-corruption efforts to achieve and maintain the highest standards of integrity. During an integrity test operation, undercover IAB investigators re-create typical police/citizen encounters and monitor the responding officer's performance. The tests allow for a member of the service to perform, or not perform, in a manner consistent with legal and Department guidelines. Integrity testing is accomplished in one of two ways. *Targeted* integrity tests are intended for a specific, identified member(s) of the service. *Random* tests, in contrast, are developed to address statistically identified corruption trends or to attain general intelligence about conditions in a particular area.

Test circumstances are usually developed to mirror allegations and/or patterns of complaints, which are identified through a comprehensive analysis of corruption allegations. The encounters include, but are not limited to arrest situations, conditions requiring a member to process narcotics and/or property, and testing a member for his/her compliance with the requirement to report corruption. The evidence derived from an integrity test failure often forms the basis for prosecuting corrupt officers. In the alternative, the outcome of an unsubstantiated allegation may impact favorably for the member of the service when he/she properly performs during an integrity test.

In 2006, the number of Integrity tests administered increased 3%. The overall Integrity test failure rate decreased 6% owing primarily to a decrease in *procedural* failures. 17% of *targeted* tests and 5% of *random* tests resulted in failures.