

Surveillance

INVESTIGATIVE DIGITAL IMAGING AND PHOTOGRAPHY

Forensic and Investigative Accounting

Computer Forensics

Processing Computer Crime Scene Investigations

94 | 2006 ANNUAL REPORT

*The Office of Professional Development* (OPD) is tasked with providing the requisite education and instruction. The OPD is comprised of the Training Section and the Educational Resource Section. Collectively responsible for researching, developing, designing, and delivering specialized training courses, the unit works to keep IAB on the cutting edge of proactive initiatives affecting internal investigations. Instruction is designed to prepare investigators to employ the most innovative and comprehensive approach to internal investigations. The two-week Internal Investigations Course (IIC), which is accredited by the New York State Board of Regents and the National Program of Non-Collegiate Sponsored Institutions, is at the core of the curriculum. This comprehensive module is recognized nationally and internationally, and is often attended by various representatives from federal, state, county and city agencies as well as several foreign police agencies.

Effective corruption control requires a collective mind-set. To promote a spirit of cooperation and advance the policy of inclusion, the Internal Affairs Bureau offers specialized training to other investigative units within the Department. Investigators from Bureau/Borough Investigations Units and Precinct Integrity Control Officers routinely attend training designed to assist them in their assignments. Furthermore, OPD regularly schedules training seminars designed to address deficiencies identified in the internal review process, or as deemed necessary by evaluation and/or recommendation.

The courses focus on advanced internal investigation techniques and related tactical issues and have included the administration of Drug Screening Tests, Financial Investigations Course, Processing Computer Evidence, and a Surveillance Course.

Since internal investigations are often complex and encompass a wide range of investigative issues, IAB investigators need to be proficient in all aspects of criminal investigations. OPD facilitates the attendance of IAB investigators at crucial Department training as well as training offered by other governmental agencies. The instruction includes, but is not limited to Sex Crimes and Child Abuse, the High Intensity Drug Trafficking Area (HIDTA) course, and seminars provided by the Federal Bureau of Investigation, and the Department of Homeland Security.

A noteworthy accomplishment in 2006 that was made possible by a grant from the U.S. Department of Justice Community Oriented Policing Services was the production of the training video "Creating a Culture of Integrity." Developed, produced, and distributed by members of the OPD, the video is a compilation of vignettes designed to elevate the viewers' awareness by depicting acts of corruption and misconduct. It is presented at all entry-level training for police recruits and civilians, and in-service, promotional, and executive level training. The video has also been distributed to 500 law enforcement agencies nationwide.







# Corruption

# Tears Us All Apart

## Report

Corruption\Serious Misconduct\Police Impersonation\Solicitation

To

The Internal Affairs Bureau

PO Box 1001

NY NY 10014

Or Call

1-212-741-8401

1-800-PRIDE-PD

Email: IAB@NYPD.Org

http://nyc.gov/html/nypd/html/iab/iabindex.html





2006 ANNUAL REPORT | 97



# PLAINTIFF'S EXHIBIT C-1





**New York City**

# Civilian Complaint Review Board

Status Report
January – June 2009

Michael R. Bloomberg, Mayor
Ernest F. Hart, Esq., Chair



# CCRB Mission and Values

The New York City Civilian Complaint Review Board (CCRB) is an independent agency. It is empowered to receive, investigate, hear, make findings, and recommend action on complaints against New York City police officers alleging the use of excessive or unnecessary force, abuse of authority, discourtesy, or the use of offensive language. The Board's investigative staff, composed entirely of civilian employees, conducts investigations in an impartial fashion. The Board forwards its findings to the Police Commissioner.

In fulfillment of its mission, the Board has pledged:

○ To encourage members of the community to file complaints when they feel they have been victims of police misconduct.

○ To encourage all parties involved in a complaint to come forward and present evidence.

○ To investigate each allegation thoroughly and impartially.

○ To make objective determinations on the merits of each case.

○ To recommend disciplinary actions that are fair and appropriate, if and when the investigative findings show that misconduct occurred.

○ To respect the rights of the civilians and officers.

○ To engage in community outreach to educate the public about the agency and to respond to concerns relevant to the agency's mandate.

○ To report relevant issues and policy matters to the Police Commissioner.

○ To offer civilians and officers the opportunity to mediate their complaints in order to promote understanding between officers and the communities they serve.

1

# Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Letter from the Chair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Who We Are . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

What We Do . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Complaints Received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

Location of Incidents Resulting in Complaints . . . . . . . . . . . . . . . . . .7

Complainant Demographics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

CCRB Dispositions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

Agency Productivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

Police Department Dispositions . . . . . . . . . . . . . . . . . . . . . . . . . . . .13



**CIVILIAN COMPLAINT REVIEW BOARD**
40 RECTOR STREET, 2ND FLOOR
NEW YORK, NEW YORK 10006 ♦ TELEPHONE (212) 442-8833
www.nyc.gov/ccrb

MICHAEL R. BLOOMBERG
MAYOR

ERNEST F. HART
CHAIR

JOAN M. THOMPSON
EXECUTIVE DIRECTOR



March 2010

Dear Members of the Public,

I am pleased to present the Board's Status Report for January-June 2009. The past six months have been a very busy period for the agency. Complaint filings are higher than past years and the economic and financial crisis has meant that we must work with a smaller budget, and therefore fewer investigators. In spite of this, the Board closed 3,704 cases in the first half of 2009, compared with 3,523 in the first half of 2008 (a 5% increase). I expect this improvement to accelerate in the second half of 2009.

Hard economic times present the Board with an opportunity as well as a challenge and, after consulting with the Board, I have established three priorities for the agency in the months to come. First, we will continue to produce high quality investigations in spite of decreases in investigative staff. Second, we will expand our highly successful mediation program. Third, we will increase awareness in the community of the CCRB and of the mediation and investigative services we offer, by extending our outreach program.

During the first six months of the year, the CCRB testified twice before the City Council: in January, about the prosecution of our substantiated cases; and in April, about trends in civilian complaints arising from NYPD stop and frisk practices. These opportunities to present testimony before the City Council are always welcome, because they enable the agency to make a real contribution to the debate about policing in our city.

I am privileged to be working with a dedicated staff and a distinguished Board, which has been strengthened by the appointments of Bishop Mitchell Taylor and David Liston, both of whom have outstanding records of service to the community. I am confident that, together, we can achieve the goals which I have described, and make a positive contribution to police-community relations in our city.

Sincerely,

Ernest F. Hart
Chair, Civilian Complaint Review Board


## CCRB Board Members January–June 2009

**Mayoral Designees**
Chair Franklin Stone, Esq.*
Chair Ernest F. Hart, Esq.*
Daniel D. Chu, Esq.
Dr. Mohammad Khalid
David G. Liston, Esq.
Carol B. Liebman, Esq.

**City Council Designees**
Youngik Yoon, Esq. (Bronx)
Singee L. Lam (Queens)**
Bishop Mitchell G. Taylor
(Queens)**
William F. Kuntz II, Esq. (Brooklyn)
James F. Donlon, Esq. (Staten Island)
Dennis deLeon, Esq. (Manhattan)***

**Police Commissioner Designees**
Tosano Simonetti
Michael McCann, Esq.
Jules A. Martin, Esq.

* In April 2009 Chair Franklin Stone, Esq. resigned and Chair Ernest F. Hart, Esq. was appointed.
** In January 2009 Board Member Singee L. Lam resigned and Board Member Bishop Mitchell G. Taylor was appointed.
*** Board Member Denis deLeon, Esq., born 1948, died on December 14, 2009.

## CCRB Organizational Chart



Case 1:12-cv-00137-LG-VVP    Document # 10    Filed 01/11/12    Page 12 of 22 PageID #: 151

## Agency Operations and Resources

The Civilian Complaint Review Board ("CCRB") is an independent city agency that investigates and mediates complaints of misconduct that members of the public file against New York City Police Department ("NYPD") officers.

The Board is comprised of thirteen members who reflect the diversity of the city's population. The City Council designates five Board members (one from each borough), the Police Commissioner designates three, and the Mayor designates five, including the Chair. Board members review and make findings on all allegations of misconduct that the Investigations Division conducts. If the Board determines that an officer committed misconduct it makes disciplinary recommendations to the Police Department.

The Board hires the Executive Director who is responsible for the agency's daily operations and the hiring and supervision of the agency's all-civilian staff. The Investigations Division, comprised of eight teams, each led by a manager with a minimum of ten years of relevant experience, conducts the agency's investigations. The Mediation Unit ensures that eligible complainants are provided with an opportunity to mediate their complaints, supervises all mediations, coordinates educational and training programs on mediation for police officers, civilians, and CCRB staff, and develops ways to improve the unit's operation. The Administrative Division analyzes statistics, processes cases for Board review, manages the agency's computer systems, facilities, and vehicle fleet, and performs budgeting, purchasing, personnel, and clerical services. The Outreach Unit makes presentations at community groups throughout the City to educate the public about the CCRB and its mandate.

To further improve the CCRB's Computerized Complaint Tracking System ("CTS"), the CCRB recently added a program to digitally record all investigative interviews and integrate these recordings directly into CTS.

Budgetary reductions taken in FY 2009 reduced the CCRB's budget by $863,513 or 7.2%. As a result, as of June 30, 2009, the agency lost 12 positions, 10 of which came from the Investigations Division, lowering the CCRB's authorized headcount from 192 to 180.



## Jurisdiction and Case Processing

The CCRB investigates and mediates complaints against NYPD officers involving four types of allegations: Force, Abuse of Authority, Discourtesy, and Offensive Language ("FADO"). Members of the public can file complaints directly with the CCRB through the City's 311 system, the CCRB's web site, by fax, or in person at the CCRB's office. Upon receipt of a complaint, a member of the CCRB's investigative staff conducts an investigation, which includes interviewing the complainant and police officers, obtaining all relevant documentary evidence, including medical records and police department documents, and writing a report summarizing the results for review by the Board. If the Board substantiates an allegation of misconduct, the case is forwarded to the NYPD Police Commissioner who has the final authority to discipline.

## Types of CCRB Allegations

The CCRB has the authority to investigate complaints by members of the public against members of the Police Department that allege misconduct involving excessive use of force, abuse of authority, discourtesy, or use of offensive language, including, but not limited to, slurs relating to race, ethnicity, religion, gender, sexual orientation and disability.

- **Force** refers to the use of unnecessary or excessive force up to and including deadly force.
- **Abuse of Authority** refers to improper street stops, frisks, searches, the issuance of retaliatory summonses, unwarranted threats of arrest, and other similar actions.
- **Discourtesy** refers to inappropriate behavior or language, including rude or obscene gestures, vulgar words, and curses.
- **Offensive Language** refers to slurs, derogatory remarks, and/or gestures that are made in reference to a person's sexual orientation, race, ethnicity, religion, gender, or disability.

## CCRB Investigation Outcomes

- **Substantiated**: The Board found sufficient credible evidence to believe that the subject officer committed the act charged in the allegation and committed misconduct.
- **Exonerated**: The Board determined that although the act at issue occurred, the subject officer's actions were lawful and proper and within the scope of the subject officer's authority under NYPD guidelines.
- **Unfounded**: The Board determined that the act that is the basis of the allegation did not occur.
- **Unsubstantiated**: The Board determined that there is insufficient evidence to establish whether an act of misconduct occurred.
- **Officer(s) Unidentified**: The Board was unable to identify the subject(s) of the alleged misconduct.
- **Miscellaneous**: The Board has jurisdiction over complaints against individuals currently employed as officers of the NYPD. Since the subject of the allegation(s) does not meet these criteria, the Board closes the allegation with a finding of Miscellaneous.



Case 1:12-cv-00137-LG-WP    Document 1-10    Filed 01/11/12    Page 14 of 22 PageID #: 156



**CCRB Complaints Received
January 2006–June 2009**

number received by the agency during the January through June period of 2008. The number of complaints received during the first half of 2009 was also 6% greater than the average number of complaints the CCRB received during any half-year period from 2006 to 2009. During prior half-year periods the agency received on average 3,800 complaints per period.

Many variables affect complaint filings; therefore, it is difficult to isolate any key factor contributing to fluctuations in complaint activity. However, as 90% of all complaints directly filed with the CCRB are received over the phone, it appears that the advent of the City's 311 phone hotline, implemented in 2003, coupled with the increased availability of cell phones, may have played an important role in causing the increase in complaints.

In the first half of 2009, complaint activity was at its highest level for any six-month period since 1993, when the CCRB was established as an independent board. During this period, members of the public filed 4,026 complaints alleging excessive use of force, abuse of authority, discourtesy, or use of offensive language. During this same period, the CCRB referred an additional 5,752 complaints outside its jurisdiction to the appropriate agencies.

As shown in the chart, the 4,026 complaints received during the January through June 2009 period represent an increase of 262 complaints from the

The proportion of complaints that contain stop, question, frisk, or search allegations as a percentage of all complaints has remained relatively steady since 2006, at a rate of approximately 33% of the total complaints received by the agency. Specifically, during the first half of 2009, 1,328 of 4,026 complaints, or 33% of all complaints received, involved allegations of stop, question, frisk, or search.

Case 1:12-cv-00137-ILG-VVP   Document 1-10   Filed 03/11/12   Page 15 of 22 PageID #: 151

The map illustrates the distribution of CCRB complaints throughout New York City from January through June 2009, based upon the location of the incident that led to the complaint. The relative distribution of complaints throughout the City has generally remained steady over time. However, this map does not reflect population density, crime statistics, precinct size, or the number of uniformed personnel assigned to a precinct.

During this period, there were nine precincts with incidents that resulted in 90 or more complaints. Four of these precincts were in Brooklyn (the 67th, 73rd, 75th, and the 79th); four were in the Bronx (the 44th, 46th, 47th, and the 52nd); and one was in Staten Island (the 120th). All of these precincts also had incidents that resulted in 90 or more complaints during the first half of 2008, with two exceptions. The 120th precinct in Staten Island had 80 complaints in the first half of 2008 and 113 complaints in the first half of 2009 and the 67th precinct had 75 complaints in the first half of 2008 and 105 in the first half of 2009. Analysis of the complaint data did not reveal a cause for these increases.

Comparatively, there were 15 precincts that had incidents resulting in 25 or fewer complaints. Five of these precincts were in Brooklyn, (the 62nd, 66th, 68th, 78th, and the 94th); five were in Queens (the 100th, 102nd, 108th, 111th and the 112th); four were in Manhattan (the 17th, 20th, Central Park Precinct ("CPP"), and the 26th); and one was in Staten Island



**Density of Complaint Filings January–June 2009**

- 0-25 Complaints
- 26-50 Complaints
- 51-89 Complaints
- 90 or More Complaints

(the 123rd). Each of these areas where 25 or fewer complaints were filed during the first half of 2009 similarly had 25 or fewer complaints during this same period in 2008, with two exceptions: the complaint rate for the 102nd precinct in Queens, decreased by 31.4%, from 35 complaints in 2008 to 24 complaints this period, and the complaint rate for the 62nd precinct in Brooklyn, decreased by 32.3% from 31 in the first half of 2008 to 21 complaints received in the first half of 2009.

Case 1:12-cv-00137-LG-VYP   Document 1-10   Filed 01/11/12   Page 16 of 22   PageID #: 158

## Complainant Demographics



### CCRB Complainant Demographics Compared to New York City Demographics



The current racial makeup of CCRB complainants remains consistent with trends from previous years. One of these consistent trends is that Blacks not only represent the majority of complainants (57%), but that this number is much greater than this group's representation as part of the New York City population as a whole, which was 23% according to the 2008 Census Bureau Survey. Hispanics made up the second highest group of complainants at a rate of 26%, although this number was similar to their representation within the city population, which is at 28%. Another trend that remained consistent was that Whites and Asians continued to represent a disproportionately low percentage of complainants. The most current data shows that Whites represented 13% of complainants while making up 35% of the City's population. Asians were underrepresented in the makeup of complainants as well, filing only 2% of complaints even though they represent 12% of the population.

The CCRB has also compiled data on the distribution of complainants throughout the City by borough of residence from January through June 2009. This data indicates that Brooklyn residents make up the largest percentage of CCRB complainants during this period, comprising approximately 36% of all complainants. Twenty four percent of complainants reside in the Bronx, 15% in Queens, 14% in Manhattan, and 4% live in Staten Island. Additionally, the CCRB received approximately 7% of complaints from non-City residents during this period. The proportion of residents of each borough who file CCRB complaints correlates closely with census data regarding the population breakdown of New York City by borough with the exception of the borough of Queens.

### CCRB Complainants by Location of Residence Compared to New York City Demographic Information



Historically, the breakdown by race of CCRB complainants has consistently differed from the breakdown by race of the City's population as reported by the United States Census Bureau. The data provided compares the most recent demographic information obtained by the Census Bureau to CCRB complaint data from January through June 2009.

Each CCRB case is comprised of one or more of the FADO allegations. Some cases are fully investigated while others are truncated because a full investigation cannot be conducted.

For full investigations, the Board reviews a case and determines if a preponderance of the evidence indicates that the officer(s) committed the alleged act of misconduct. If the Board determines that there is sufficient evidence of misconduct, it closes the case as substantiated. The Board closes a case as unsubstantiated if it finds that the evidence provided is insufficient to make a determination; unfounded if it finds that the officer did not commit the alleged act of misconduct; exonerated if the officer's alleged actions were determined to be lawful and proper. Cases are closed as officer unidentified if identification cannot be made and as miscellaneous if the officer is no longer employed by the NYPD.



Disposition of All Allegations in Full Investigations January 2006–June 2009

Legend:
- Miscellaneous
- Officer unidentified
- Unsubstantiated
- Exonerated
- Unfounded
- Substantiated

Cases are truncated when the complainant and/or alleged victim(s) withdraw the complaint, refuse to provide a formal statement, or cannot be located. The Board then closes the case as complaint withdrawn, complainant/victim uncooperative, complainant/victim unavailable, or victim unidentified, depending on the underlying circumstances. At the Board's discretion, a truncated case may be reopened upon request.

The CCRB closed 3,704 cases during the period of January through June 2009. Of these 1,185 (32%) were full investigations and 2,429 (66%) were truncated. The remaining 90 (2%) were closed through the Mediation Unit. Of the 1,185 cases that were closed as full investigations, 85 (7%) were closed as substantiated. This is a decrease from the substantiation rate from the first half of 2008 which was 100 of 1,202 (8%). The percentage of individual allegations substantiated

in fully investigated cases during this period and the first half of 2008, however, remained at 4%. In the first half of 2009, 212 of 4,770 allegations were substantiated and in the first half of 2008, 228 of 5,203 allegations were substantiated. The percentage of allegations that were unsubstantiated during this period increased slightly from 37% of all fully investigated allegations in the first half of 2008 to 39% in the first half of 2009. The percentage of allegations that were exonerated and those determined to be unfounded remained constant. In the first half of 2008, 33% of allegations were exonerated and 12% were unfounded. Similarly, in the first half of 2009, 32% of allegations were exonerated and 13% were unfounded. Allegations where the officer was unidentified decreased from 11% for the first half of 2008 to 9% for the first half of 2009.

### Average Number of Days to Complete a Full Investigation January 2006–June 2009



took on average 359 days to complete a full investigation and during the first half of 2008 it took on average 308 days. Factors contributing to this increase were a rise in the number of complaints received during the first half of 2009 and the decrease in investigative staff, which resulted in larger caseloads per investigator.

However, the agency saw an improvement in the average number of case closures per investigator, which stood higher than the average number of cases closed in any prior period. During this period, each investigator closed on average 33 cases, an increase from the 30 cases that each investigator closed on average during this period in 2008. Additionally, the agency saw an improvement in the number of cases that it closed overall, closing a total of 3,930 cases in the first half of 2009 compared to the 3,529 cases that it closed during the first half of 2008. Full investigation closures also increased from 1,224 in the first half of 2008 to 1,322 in the first half of 2009, while truncated case closures rose from 2,305 in the first half of 2008 to 2,608 in the first half of 2009. The ratio between the number of full to truncated cases that were closed during the first half of 2008 and those that were closed during this year's period remained the same.

The CCRB uses the term "open docket" to refer to the number of open cases being processed by the agency at a given time. The agency's open docket as of June 30, 2009 was higher than the agency's open docket as of June 30, 2008. As of July 1, 2009, the CCRB had 4,120 open cases compared to July 1, 2008, when the agency had 3,613 open cases.

The average number of days it took an investigator to close a full investigation during the first half of 2009 increased by 51 days. During the first half of 2009 it

# Mediation

Mediation is a process where the civilian and officer meet with a neutral, trained mediator to address the issues raised by the complaint. The mediator guides discussion between the parties to help them resolve the complaint. Cases are closed as "mediated" when the parties agree that the issues raised by the complaint have been resolved. The agency closes cases as "mediation attempted" when the complainant and officer agreed to mediate but the civilian fails to appear for the mediation twice without good cause, or fails to respond to phone calls, e-mails, or letters to set up a session.

The CCRB has the largest voluntary mediation program for complaints against the police in the United States and has placed a great deal of emphasis on continuing to improve the program. In the first half of 2009, 65 out of 90 cases were successfully mediated, showing an improvement from the first half of 2008 when 48 out of 89 cases were mediated successfully.



**Total Number of Mediation Unit Closures January 2006–June 2009**

| Period | Mediated | Mediation attempted |
|---|---|---|
| Jan-Jun 2006 | 62 | 72 |
| July-Dec 2006 | 68 | 55 |
| Jan-Jun 2007 | 56 | 45 |
| July-Dec 2007 | 46 | 43 |
| Jan-Jun 2008 | 48 | 41 |
| July-Dec 2008 | 64 | 39 |
| Jan-Jun 2009 | 65 | 25 |

Another way that the Mediation Unit monitors its success is through the satisfaction of the officers and complainants who engage in the mediation process. Keeping in stride with the latest national developments in civilian oversight, the Mediation Unit began distributing a Civilian-Officer Satisfaction Survey in June in order to monitor how satisfied participants are with the mediation process and with the outcome. Initial results show that 100% of officers and 97% of civilians are satisfied with the CCRB's mediation process. In October, the Unit presented information regarding the survey and other developments at the National Association for Civilian Oversight of Law Enforcement (NACOLE)'s annual conference.

The Mediation Unit continues to work to increase the number of mediations it conducts, making presentations to officers and civilians to educate them about the process. During this semi-annual period, the Unit began working with the NYPD and the Patrolmen's Benevolent Association (PBA) to develop methods of distributing information about the program to police officers. Both the NYPD and the PBA recognize the benefits of mediation and encourage officers to participate in the process.

# Mediation Case Example

The complainant illegally parked his car at a corner and, through the window, started talking to several young men. Observing the illegally parked car, the subject officer approached, asked the complainant for identification and told him to move his car. When the complainant questioned the officer's request for identification, the officer allegedly responded by repeating her request several times and eventually yelling "Give me your f***ing license and registration." The complainant responded by yelling and using profanity. Thereafter, he filed a complaint with the CCRB about the encounter and chose to resolve it through mediation.

At the mediation the complainant explained that he was upset about the way the subject officer demanded his identification and the officer countered that complainant's use of profanity was disrespectful and undermined her authority. Through the mediation, the parties began to appreciate one another's point of view. The complainant explained that he was parked illegally because he wanted to catch the young men to convince them not to hang out on a street corner. He acknowledged that being tough is part of an officer's job, but was surprised by the officer's abrasive tone and refusal to answer his questions about her request for identification. At the mediator's suggestion, the complainant put himself in the officer's position and saw that, given her position as an officer, it was necessary for her to be persistent in her request for identification when the complainant did not initially comply. The subject officer was then asked to assess how she handled the situation. She shared that colleagues had previously told her that at times her manner was abrasive and that she needed to be conscious of her conduct so that she does not become overly aggressive or use profanity during civilian encounters. The complainant also recognized that he should be more cautious in the language he uses and that he should not have used profanity when addressing the subject officer.

Following this discussion, both parties discovered their mutual interest in the well-being of the neighborhood youth. They exchanged apologies and the mediation concluded.

Case 1:12-cv-00437-KLE-VVP    Document 1-40    Filed 01/11/12    Page 21 of 22 PageID #: 163

When the Board determines that an officer committed misconduct, it forwards the case to the Police Commissioner with a disciplinary recommendation. Pursuant to the New York City Charter the Police Commissioner retains sole discretion over whether to issue discipline and the level of punishment if discipline is imposed.

In the first half of 2009, the Police Department closed 133 cases that had previously been substantiated by the CCRB. The Department pursued discipline in 83 cases, one case was closed as it was received after expiration of the 18 month statute of limitation and the Department declined to pursue discipline in 49 (37%) of the cases. The number of declinations for the first half of 2009 is consistent with prior half-year periods since 2007 during which the Department declined to impose discipline in, on average, 48 cases per half-year period. However, prior to 2007, the Department declined to impose discipline in 10 or fewer cases during each half-year period. The CCRB and the Department Advocate's Office worked closely during this period to better understand the reasons for the declinations and to reduce the number of future declinations.

Of the cases in which the Department brought charges during the first half of 2009, 8 officers pled guilty and 6 officers went to trial. Of the 6 cases that went to trial, 4 officers were found not guilty and 2 were found guilty. Thirty-six officers received command discipline, which can result in the loss of up to 10 vacation days and 29 officers received instructions, a formal procedure during which an officer is instructed on the appropriate legal and/or Departmental standards for the incident in question.



Police Department Pursued Discipline in Substantiated CCRB Cases January 2006–June 2009



Police Department Action in Substantiated CCRB Cases January 2006–June 2009



"It is in the interest of the people of the city of New York and the New York City police department that the investigation of complaints concerning misconduct by officers of the department towards members of the public be complete, thorough and impartial. These inquiries must be conducted fairly and independently, and in a manner in which the public and the police department have confidence. An independent civilian complaint review board is hereby established as a body comprised solely of members of the public with the authority to investigate allegations of police misconduct as provided in this section."

New York City Charter, Chapter 18-A

 | **Civilian Complaint Review Board**

**New York City Civilian Complaint Review Board**
40 Rector Street, 2nd Floor
New York, NY 10006

Complaints and General Information
Dial 212-442-8833 or 311
Outside NYC: 212-NEW-YORK
TTY/TDD: 212-504-4115

**www.nyc.gov/ccrb**